**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ONLINE MERCHANTS GUILD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. _____ |
| | ) | |
| C. DANIEL HASSELL,  in his | ) | |
| official capacity as | ) | |
| SECRETARY OF REVENUE, | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| | ) | |
| Defendant. | ) | |

**Complaint for Declaratory and Injunctive Relief**

**Introductory Statement**

1. The Online Merchants Guild ("the Guild"), a trade association for e-commerce merchants, brings this action to challenge violations of federal constitutional and statutory law by the Pennsylvania Department of Revenue under the control of C. Daniel Hassell, Secretary of Revenue.

2. The backstory is the DOR's favoritism toward Amazon, which resulted in a nine- or ten-figure subsidy to Amazon over much of the last decade. Specifically, the DOR declined to make Amazon collect sales taxes on the vast majority of its sales, which allowed Amazon to charge artificially lower prices and thereby capture market share. As the House Antitrust

1

Subcommittee concluded after a sixteen-month investigation, "Amazon

expanded its market power through avoiding taxes [and] extracting state

subsidies."[1]

3.  The particular subsidy at issue here occurred while Pennsylvania officials

were otherwise giving and offering Amazon billions to entice the company

to develop projects like "HQ2" in the Commonwealth.[2]

4.  If that is as far as it went, it might just be bad public policy for the

Commonwealth, but would not necessarily have required this lawsuit.

However, the DOR has recently begun targeting the Guild's members in

preparation to demand that *they* pay Amazon's back taxes. The same thing is

playing out across the country as state tax authorities seek to dig out of

similar budget holes, while maintaining a friendly relationship with Amazon,

by demanding that Amazon's suppliers—small, politically weak suppliers

like the Guild's members—pay for taxes those regulators let Amazon refuse

to collect. That revenue strategy violates a number of federal laws, ranging

from the Due Process Clause to the Commerce Clause to the Internet Tax

Freedom Act.

---

[1] U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial and Administrative Law, "Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations" at 261, https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.
[2] *See infra* nn. *15–17*.

5.  Despite the breadth of the overall issues, this case challenges discrete aspects of the DOR's actions. Chiefly, the DOR's recent demand that the Guild's non-resident members register with the DOR, and the DOR's position that the department can summarily declare that non-residents are somehow turned into quasi-residents by Amazon's decision to store goods they supplied in Amazon's Pennsylvania warehouses, which the DOR in turn contends makes the Guild's members ineligible for the protection of federal law.

## Background

6.  Like many trends, this one seems to have begun in California—as journalism by *The Philadelphia Inquirer* exposed. In November 2019, *The Inquirer* reported that a "36-year-old Bucks County resident recently received a jaw-dropping notice from California that he could owe as much as $1.6 million for sales tax that he didn't collect from consumers who bought his goods through Amazon."[3] The Bucks County resident, Guild member Brian Freifelder, is a third-party merchant on Amazon who supplies Amazon's Fulfilled by Amazon ("FBA") program. The vast majority of

---

[3] Harold Brubaker, "California Hits Philly-Area Amazon Seller with $1.6 Million Sales-Tax Bill," *The Philadelphia Inquirer* (November 5, 2019), https://www.inquirer.com/business/california-sales-tax-amazon-seller-philadelphia-business-20191105.html.

items Amazon sells are sourced from third-party merchants who supply the FBA program.

7. Freifelder was one of "hundreds of thousands" of FBA suppliers informed by the California Department of Tax and Fee Administration that they should have been collecting taxes on Amazon's sales to California residents as far back as 2012.[4]

8. As Freifelder put it, California's demand was "absurd."[5] He explained: "I haven't sold enough inventory over time to warrant a tax bill like that. You could take every sale I've ever done. You could take the biggest sellers on Amazon, and I don't think they would have a bill like that."[6]

9. While *The Inquirer* reported on California, a broadly similar pattern was unfolding in *The Inquirer*'s backyard. Guild members are now receiving letters from the Pennsylvania DOR claiming that they "may have a physical presence in the Commonwealth and may be subject to Pennsylvania's income and sales tax laws . . . ."[7] Their purported physical presence is based on Amazon's unilateral decision to store FBA inventory in fulfilment centers located in Pennsylvania. The DOR letters threaten back taxes "starting with

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] Declaration of Regan Blee (Exhibit 1); Declaration of J. Scott Moody (Exhibit 2).

4

the date that property was first located within the state." The DOR also threatens monetary penalties. As explained below, the DOR's positions are contrary to federal law.

## Jurisdiction and Venue

10. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United states, including the Due Process Clause, the Commerce Clause, and the Internet Tax Freedom Act.

11. The Court has personal jurisdiction over defendant Hassell and the agency he leads, DOR, which is headquartered in Harrisburg, Pennsylvania. The Online Merchants Guild submits to the personal jurisdiction of this Court for purposes of this action.

12. Venue is proper under 28 U.S.C. § 1391 because defendant Hassell and his agency reside in Harrisburg and a "substantial part of the events or omissions giving rise to the claim occurred" within this District.

13. The Tax Injunction Act, 28 U.S.C. § 1341, does not preclude this Court's exercise of jurisdiction because, *inter alia*, the Guild challenges provisions and conduct outside the scope of the TIA's putative jurisdiction-stripping provisions.

5

**Parties and Standing**

14. The Online Merchants Guild is a trade association for online merchants.[8]
    The Guild's purpose is to advocate for a free and fairly regulated online
    marketplace, and for the interests of online merchants. The Guild provides a
    common voice for the diverse group of merchants who supply Amazon's
    store and other online stores. The Guild's membership, which numbers in
    the hundreds, is almost entirely comprised of small and micro-businesses
    that members have built from scratch. Many of the Guild's members are true
    kitchen-table enterprises. Often, e-commerce provides the Guild's members
    a means of earning self-sufficiency despite disadvantages and setbacks. The
    Online Merchants Guild is a resident of Wyoming.

15. The Online Merchants Guild has standing in its own right because the
    organization has been forced to divert its resources to address the impacts of
    the challenged DOR conduct, as set forth in greater detail in the declaration
    of Paul S. Rafelson, the Guild's Executive Director.[9]

16. The Online Merchants Guild also has standing on behalf of its members,
    who are or may be affected by the DOR conduct challenged herein. The
    Guild's members would have standing in their own right because they have

---

[8] *See* Declaration of Paul S. Rafelson (Exhibit 3).
[9] *See id*.

been or may be subject to DOR's challenged conduct. The interests the

Guild seeks to represent are germane to the organization's purpose set forth

above. This lawsuit will not necessarily require the participation of the

Guild's members as plaintiffs.

17. Defendant Hassell is the Secretary of Revenue of DOR, which is the

Pennsylvania state agency responsible for collection of sales, use, and

income tax. Defendant Hassell and DOR are residents of Pennsylvania.

## Factual Allegations

### Amazon's FBA Program

18. The Guild's members include hundreds of online merchants who participate

in the interstate e-commerce market. For many of the Guild's members,

Amazon's store is the dominant, if not exclusive, means by which they

participate in interstate e-commerce. Amazon's importance to e-commerce,

and small business e-commerce in particular, cannot be overstated.

According to some reports, Amazon has nearly half of the entire e-

commerce market in the U.S.[10] Amazon's closest "competitor," the

behemoth Walmart, has less than 10% of that market.[11] Amazon's role in

---

[10] *See, e.g.,* Wayne Duggan, "Latest E-Commerce Market Share Numbers
Highlight Amazon's Dominance," Yahoo! Finance (Feb. 4, 2020),
https://finance.yahoo.com/news/latest-e-commerce-market-share-185120510.html
[11] *Id.*

American commerce has only grown in importance as a result of the Covid-19 pandemic as more shopping moves online. Meanwhile, small businesses like the Guild's members are under greater strain.

19. This case involves the regulatory environment around Amazon's FBA program. The gist of FBA is that Amazon relies on millions of third-party merchants to source goods for Amazon's store. Those merchants identify and source items that Amazon might choose to carry in its store. The merchants convey the goods to Amazon to warehouse and, if purchased in Amazon's store, to ship to the consumer. That is, Amazon fulfills the order, hence the name, Fulfilled by Amazon. By contrast, a smaller fraction of sales on Amazon are what Amazon considers "first-party" sales, in which Amazon itself sources the goods. From the consumer's perspective, there is little if any substantive difference between the two categories, which are offered alongside one another, sold in the same transactions, and arrive in the same Amazon boxes on the same Amazon trucks.

20. FBA is a consignment arrangement. Amazon takes physical possession of goods from its supplier-consignors, stores the goods, offers them to Amazon's customers, and sells and delivers them to its customers without the involvement of consignors.

21. FBA generally works as follows. Third-party merchants, such as Guild members, source products for possible sale on Amazon. Merchants propose a sale price to Amazon.[12] Amazon has full discretion to approve the products for sale, and to approve or reject the price, using an internal algorithm whose precise features are unknown to merchants. Amazon also retains editorial control over product listings. Amazon also controls where and how products are listed on the site—*i.e.*, the results consumers see when they search.

22. After Amazon approves a merchant's proposed listing, Amazon will direct the merchant to ship the products to a warehouse of Amazon's choosing. From there, Amazon may keep the goods in that warehouse, or ship them anywhere for positioning, including after breaking up the lot.

23. After a consumer purchases a product in Amazon's store, Amazon is responsible for selecting the warehouse from which to draw the product, packing the product, and shipping it to the consumer. Amazon also collects payment, and—after holding onto the funds for several weeks—credits the merchant's account. On FBA sales, Amazon charges merchants a commission that can reach 45%.

---

[12] See Amazon, "Business Solutions Agreement," https://sellercentral.amazon.com/gp/help/external/G1791?language=en_US.

24. Amazon is in privity with consumers, whom Amazon deems the company's "customers." By contrast, under the terms of merchants' agreement with Amazon, merchants are not in privity with consumers. Amazon generally forbids merchant contact with consumers.

25. For most Guild members, FBA is critical to survival on Amazon, despite the high commission. FBA can account for over 90% of sales for many members.

26. To implement FBA, Amazon has a network of more than 180 fulfillment and sortation centers around North America.[13] Amazon no doubt has a sophisticated algorithm for where it stores items, but that algorithm is unknown to the Guild's members and beyond their control. Amazon has a reported eighteen FBA facilities in Pennsylvania, where it unilaterally chooses to store Guild members' goods.

27. Once Guild members transfer custody of their goods to Amazon, they have no say in where Amazon moves the goods. Guild members have no control over which warehouse or warehouses Amazon chooses to use for storage. Guild members cannot instruct Amazon to use or not use warehouses in certain states. Nor can they order Amazon to pull goods out of certain states.

---

[13] Seller Essentials, "Amazon Warehouse Locations," https://selleressentials.com/amazon/amazon-fulfillment-centerlocations/.

When a consumer makes a purchase, Guild members cannot tell Amazon which warehouse to ship the item from.

28. FBA has contributed to Amazon's wild success by allowing the company to externalize various supply chain costs—and by allowing Amazon to offer artificially low prices by avoiding collecting sales tax.

29. For much of the last decade, Amazon refused to collect sales taxes on FBA sales. To illustrate, assume that a consumer in 2016 bought two items—one that Amazon considered a "first-party sale," and one that Amazon considered a "third-party sale." Amazon would have collected sales tax on the former but not the latter, even though both were purchased and delivered together.

30. Most sales on Amazon are FBA sales, meaning that most sales had an artificially lower price. Amazon's artificially lower prices gave the company a significant pricing advantage over brick-and-mortar stores and online competitors who did collect sales tax. Consumers, predictably, shopped in the store with lower prices, which helped contribute to the downfall of various retailers. Amazon's artificially low prices also helped lure consumers to enroll in Amazon Prime, which was key to Amazon's growth strategy. Essentially, Amazon profited by creating a giant tax-free store. As *Capital & Main* observed, "It's highly likely that Amazon clears more profit

than marketplace sellers on their transactions. So Amazon, by proxy,
benefits financially from third-party tax avoidance, and the pricing
advantage it provides. And, by not collecting tax, Amazon even avoids
liability for mistakes made by third-party sellers that could trigger audits."[14]
That is part of Amazon's overall strategy: "Amazon's continuous resistance
to collecting sales taxes made it the first major American company to build
its business based on tax avoidance. Contrary to popular belief, the company
is still resisting today."[15]

### Pennsylvania Sales Tax Regime

31. As part of its overall strategy of tax avoidance, Amazon had for years
refused to collect Pennsylvania's six percent sales tax while nonetheless
taking customers' money and giving them title and possession of goods in
exchange.[16]

32. As *PennLive* reported in 2012, "[t]he online retail giant had previously
refused to register to collect Pennsylvania's 6 percent levy on its orders.
But a spokesman said the company reversed itself because a state directive

---

[14] David Dayen, "The 'Amazon Tax' Ruling: Disrupting the Disruptors?," Capital
& Main (July 10, 2018),
https://capitalandmain.com/the-amazon-tax-ruling-disrupting-the-disruptors-0710.
[15] *Id.*
[16] *But see* 61 Pa. Code § 31.1 ("An excise tax shall be imposed upon the sale at
retail . . . of tangible personal property. . . . Sale at retail includes a transfer for
value of the ownership, custody or possession of tangible personal property.").

requiring it" took effect in August 2012.[17] That concession was limited to what Amazon considered "first-party sales," meaning the company still refused to collect sales taxes on FBA sales. That was not a surprise to the DOR, and it translated into a huge private subsidy for Amazon.

33. That subsidy occurred in the midst of many others (although those were at least public and subject to democratic accountability). For instance, in 2016, Pennsylvania gave Amazon over twenty-two million dollars in grants, funding, and tax credits in exchange for Amazon placing fulfillment and distribution centers in Pennsylvania.[18]

34. In 2017, the Commonwealth aggressively courted Amazon in hopes of securing its second headquarters in either Pittsburgh or Philadelphia, offering Amazon "$4.6 billion in tax incentives over 25 years to build its second headquarters in the state."[19]

---

[17] "Amazon.com to begin collecting Pennsylvania sales tax," PennLive (Aug. 29, 2012), https://www.pennlive.com/midstate/2012/08/amazoncom_to_begin_collecting.html

[18] David M. Kall, "Pennsylvania: Amazon.com to receive $22.5 million in state funding" (Aug. 4, 2016), https://mcdonaldhopkins.com/Insights/August-2016/Pennsylvania-Amazon-com-to-receive-22-5-million-in; "Pennsylvania Gives $5M in Grants, $15M in Tax Credits to Amazon to Brings Jobs to State," NBCPhiladelphia.com (July 22, 2016), https://www.nbcphiladelphia.com/news/local/amazon-fulfillment-centers-pennsylvania/64898/.

[19] Andrew Wagaman, "Pennsylvania Offered Amazon up to $4.6 Billion over 25 Years," The Morning Call (describing the Commonwealth's October 2017

35. In 2019, Pennsylvania offered Amazon "$1.6 million in tax credits in exchange for opening a non-sortable fulfillment center in Findlay Township."[20]

36. The sales tax subsidy could not go on forever—the numbers, and the unfair advantage over other businesses—probably became too large to disregard. Ultimately, the Pennsylvania legislature passed Act 43 of 2017, which amended the Tax Reform Code of 1971 to establish marketplace sales tax collection, notice, and reporting requirements on Amazon (and other e-commerce actors).[21]

37. "Act 43 of 2017 adds Part V-A to Article II, giving certain marketplace facilitators, remote sellers, and referrers the option to either collect and remit the sales tax that is due on taxable sales within the Commonwealth, or elect to notify their customers that use tax may be due, and report to the Department the customers names, addresses, and aggregate dollar amounts

proposal to Amazon), https://www.mcall.com/business/mc-biz-amazon-hq2-proposal-lehigh-pennsylvania-sidebar-20181113-story.html.

[20] "Governor Wolf: Amazon Expansion to Bring 800 Jobs to Allegheny County," Official Press Release (July 30, 2019), https://www.governor.pa.gov/newsroom/governor-wolf-amazon-expansion-to-bring-800-jobs-to-allegheny-county/.

[21] 72 P.S. § 7213 et seq.; Pennsylvania Department of Revenue, Sales and Use Tax Bulletin 2018-01 (January 26, 2018), https://www.revenue.pa.gov/GeneralTaxInformation/TaxLawPoliciesBulletinsNotices/TaxBulletins/SUT/Documents/st_bulletin_2018-01.pdf

of each customer's purchases. 72 P.S. § 7213 et seq. 'Marketplace facilitators' are defined as persons, including vendors, who list or advertise tangible personal property for sale in any forum, directly or indirectly, collect the payment from the purchaser, and transmit the payment to the marketplace seller. 72 P.S. § 7213(c). A 'marketplace seller' is one who uses a marketplace facilitator to facilitate a sale. 72 P.S. § 7213(d)."[22]

38. "If the marketplace facilitator maintains a place of business within the Commonwealth, the facilitator already is mandated by the TRC to collect sales tax on sales made on its own behalf, and on behalf of any marketplace seller for whom a sale within Pennsylvania is facilitated."[23]

39. The upshot of Act 43 is that Amazon, beginning in 2018, began to collect sales taxes on FBA sales.[24]

40. A different law, Act 13 of 2019, codified the Commonwealth's *Wayfair* threshold," which was required by the Supreme Court's decision in *South*

---

[22] *Id.*

[23] *Id.*

[24] Tom Knapp, "Amazon will begin collecting sales tax on shipments to Pennsylvania," *Lancaster Online* (March 6, 2018), https://lancasteronline.com/news/local/amazon-will-begin-collecting-sales-tax-on-shipments-to-pennsylvania/article_0d380ee6-215b-11e8-a5ed-4b0228b0798f.html; Ari Levy, "Amazon will start collecting sales tax for shipments to Pennsylvania as states seek to recoup billions," CNBC.com (March 2, 2018), https://www.cnbc.com/2017/11/15/amazon-marketplace-tax-collection-comes-to-washington-in-2018.html

*Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018). As a matter of Commerce

Clause protection for smaller enterprises, *Wayfair* requires states not to

demand sales taxes from non-resident merchants who make a modest

amount of sales into a state. The basic idea is to limit the administrative

burden on smaller enterprises who, the Supreme Court reasoned, would

struggle to comply with tax-collection obligations in fifty different states.

Pennsylvania set its threshold at $100,000. But the DOR has concluded that,

if Amazon stores goods supplied by a non-resident in a Pennsylvania

warehouse, that supplier is no longer an out-of-state person and is therefore

ineligible for *Wayfair*'s protections.

### The DOR's Registration Demands

41. Recently, FBA sellers—including Guild members—have been receiving the

following letter from DOR:

> The Pennsylvania Department of Revenue has determined that your
> business may have a physical presence in the Commonwealth and
> may be subject to Pennsylvania's income and sales tax laws. The
> Department of Revenue is currently offering a voluntary compliance
> program to help certain businesses become compliant with past due
> tax obligations. This business may be eligible to participate in that
> program.
>
> Pennsylvania's Tax Reform Code provides that *storing property or
> the property of a representative, including inventory, at a distribution
> or fulfillment center, or any other location within the Commonwealth,
> constitutes a physical presence that creates certain tax obligations
> with Pennsylvania.* Income and applicable sales taxes should be

reported and remitted to the Pennsylvania Department of Revenue starting with the date that property was first located within the state.

The voluntary compliance program is offering a limited lookback period from Jan. 1, 2019. Businesses that choose to participate in this voluntary compliance program will not be liable for taxes prior to this date. They will also be given penalty relief for any non-compliance for past due tax returns that were not filed and taxes that were not paid.[25]

42. The gist is that, in the DOR's view, a non-resident's participation in FBA—and Amazon's decision to store goods in a Pennsylvania warehouse—gives the DOR jurisdiction over those non-residents. The registration demand is apparently a precursor to tax demands: rather than asking Amazon to pay its back taxes, the DOR intends to collect those sums from Amazon's suppliers (and then perhaps to seek income tax on top, in possible violation of Public Law 86-272).

43. As one would expect, the Guild's members do not have those sales tax receipts because Amazon did not collect them from its customers.[26] So the funds would have to come out of the Guild's members' pockets. That is devastating for small businesses and is injuring their participation in the interstate economy. The seller community is well aware of FBA merchants who have been forced to pay tens and hundreds of thousands for Amazon's

---

[25] *See* Exhibit 1; 2.
[26] *Id*.

back taxes, with little to no hope of ever recovering those sums from the states. But, because of enforcement threats, many merchants feel compelled to register.

44. The administrative costs and burdens are likewise significant. Registering, collecting, and preparing sales and income tax returns across fifty states (and potentially sub-state jurisdictions) is complex and costly. The compliance costs would likely overwhelm the thin profit margins of many small e-commerce businesses, and would effectively drive them out of the interstate market, contrary to basic due process, fairness, and Commerce Clause principles. *See, e.g.*, *Wayfair*, 138 S. Ct. at 2098–99.

45. To participate in the "voluntary compliance program," a business must "complete the enclosed questionnaire and return it to the department within fifteen (15) days from the date of this letter."

46. As Guild members explain, although the "voluntary compliance program" is presented as a sort of "amnesty," it reads more like a threat: merchants who decline to register will face dramatically increased tax demands over a longer lookback period.[27]

47. Finally, the letter warns that the *Wayfair* threshold does not apply, as it "applies only to those businesses with no physical presence in Pennsylvania.

---

[27] Exhibit 1; 2.

If this business has property or inventory located within Pennsylvania, it does not fall under the provision of these laws."[28]

## Causes of Action

### Count 1: DOR's registration demands violate the Due Process Clause.

48. The Online Merchants Guild incorporates the foregoing paragraphs as if set forth herein.

49. The DOR lacks personal jurisdiction over the Guild members at issue based on their participation in Amazon's FBA program, because Amazon—not the Guild's members—controls whether items in Amazon's possession are stored in Pennsylvania.

50. Absent personal jurisdiction over them, the DOR cannot demand that the affected Guild members register with the Department (or succumb to other demands).

51. DOR's conduct has caused and will continue to cause irreparable injury to the Online Merchants Guild and its members.

52. Injunctive and declaratory relief is necessary to remedy DOR's violations of law and to vindicate the constitutional rights of the Guild and its members and to prevent further irreparable injury to the Guild's members and the interstate economy.

---

[28] *Id.*

**Count 2: DOR is violating the Commerce Clause by imposing discriminatory and burdensome restrictions on interstate commerce.**

53. The Online Merchants Guild incorporates the foregoing paragraphs as if set forth herein.

54. The DOR's registration demand is driven by a political imperative to impose costs on the Guild's non-resident members as opposed to Amazon, which constitutes discrimination against out-of-state merchants in favor of Amazon's in-state presence and power. That discrimination is a *per se* violation of the dormant Commerce Clause. Moreover, the burdens thereof outweigh any putative benefits.

55. The DOR's position that *Wayfair* does not protect non-residents is contrary to *Wayfair* itself. The Commonwealth cannot evade Commerce Clause protections for non-residents by deeming them quasi-residents, especially not on the basis of unilateral storage choices by a third party.

56. DOR's conduct has caused and will continue to cause damages and irreparable injury to the Online Merchants Guild and its members.

57. Injunctive and declaratory relief is necessary to remedy DOR's violations of law and to vindicate the constitutional rights of the Guild and its members and to prevent further irreparable injury to the Guild's members and the interstate economy.

## Count 3: DOR is violating the Internet Tax Freedom Act.

58. The Online Merchants Guild incorporates the foregoing paragraphs as if set forth herein.

59. The Internet Tax Freedom Act prohibits Pennsylvania from, *inter alia*, imposing "discriminatory taxes on electronic commerce," which are defined as "an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means." ITFA § 1101(a)(2); § 1105(2)(A)(iii), codified at 47 U.S.C. § 151, Note.

60. Upon information and belief, the DOR does not demand that non-resident suppliers of brick-and-mortar consignment stores, or suppliers of other brick-and-mortar stores with supplier arrangements similar to Amazon's, register with the DOR for tax-collection purposes. Instead, the DOR requires the stores themselves—the point of sale—to register as tax collectors. But, in order to preference Amazon, the DOR has adopted a special practice by seeking to treat Amazon's consignor-suppliers as tax agents and requiring them to register accordingly.

61. DOR's conduct has caused and will continue to cause damages and irreparable injury to the Online Merchants Guild and its members.

62. Injunctive and declaratory relief is necessary to remedy DOR's violations of law and to vindicate the constitutional rights of the Guild and its members and to prevent further irreparable injury to the Guild's members and the interstate economy.

**Prayer for Relief**

63. The Online Merchants Guild respectfully requests, on behalf of itself and its members, the following relief:

    a.  A declaration pursuant to 28 U.S.C. § 2201 that DOR's conduct and application of Pennsylvania law to the Online Merchants Guild's members as set forth herein is unconstitutional;

    b.  An order and judgment enjoining DOR from further such constitutional violations;

    c.  Costs and attorney's fees pursuant to 42 US.C. § 1988;

    d.  A jury trial on all issues so triable; and

    e.  All other appropriate relief.

Dated this 26th day of February, 2021.

*s/ David F. Wilk, Esq.*
David F. Wilk
ID#65992
140 East Third Street
Williamsport, Pennsylvania 17701
570-323-3768

davew@lepleylaw.com

Aaron K. Block (*pro hac vice* motion
to be filed)
The Block Firm LLC
4200 Northside Parkway
Building 1, Suite 200
Atlanta, Georgia 30327
404-997-8419
aaron@blockfirmllc.com

Paul S. Rafelson (*pro hac vice* motion
to be filed)
Rafelson Schick, PLLC
2255 Glades Road, Suite 319
Boca Raton, Florida 33431
833-326-6529
paul@frsattorneys.com
Counsel for the Online Merchants Guild