IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ONLINE MERCHANTS GUILD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 1:21-cv-00369-CCC |
| | ) |
| C. DANIEL HASSELL, | ) |
| in his official capacity as | ) |
| SECRETARY OF REVENUE, | ) |
| DEPARTMENT OF REVENUE, | ) |
| | ) |
| Defendant. | ) |

**The Online Merchants Guild's Reply Brief in Support of Its
Motion for Preliminary Injunction**

The Department's opposition to the Guild's motion for a preliminary injunction relies almost entirely on a strained construction of the Guild's theory of this case and the letters from the Department that prompted it. The Guild does not challenge the Department's "authority *to send a letter* to businesses advising that they *may* be subject to Pennsylvania's income and sales tax laws."[1] Instead, the Guild challenges what that those letters assert—that the Department has the constitutional power to force the Guild's members to register with the Department and impose those tax obligations on them.

---

[1] Doc. 25 at i (first emphasis added).

1

The dispute over whether the Department has that authority is cognizable under Article III because the Department's assertion of authority has already injured both the Guild and its members. With jurisdiction established, the Department has not met its heavy burden to justify discretionary abstention under the comity doctrine.

On the merits, as the Guild has explained—and as the Department has not squarely rebutted—the Department's underlying claim to authority likely violates the Constitution. That and the other preliminary injunction factors justify an injunction to preserve the *status quo ante* while this litigation proceeds.

## Argument

a. **The Guild challenges the Department's assertion of authority, not the mere act of mailing letters.**

The gravamen of this case is whether the Department has the constitutional power to make the registration demands in letters the Department sent to more than 11,000 people.[2] Those letters are not just an FYI or a mere "request for information"[3]; they carry real-world consequences. From the Guild's members' perspective, the situation is something like this. Imagine you're a small business owner in New Hampshire or some other state, or as far away as Australia.[4] You depend on Amazon FBA to access the national e-commerce market because Amazon controls e-

---

[2] *See* Doc. 25 at 22 ¶ 4 (describing how, "as of March 23, 2021," the Department had "sent 11,263 letters"). Pin-cites are keyed to the CM/ECF pagination.
[3] Doc. 25 at 14.
[4] Doc. 10-2; 10-3.

commerce in this country.[5] You know that some states, led by California, are rethinking the massive subsidies they gave Amazon over the last decade, which took the form of looking the other way when Amazon refused to collect sales taxes in its store.[6] But rather than asking Amazon to pay its debts, tax collectors in those states are trying to shift those legacy costs onto small, politically weak outsiders who cannot mold state policy the way Amazon can.[7]

You open your mail to find a letter from the Pennsylvania Department of Revenue, informing you that storing "inventory [] at a distribution or fulfillment center . . . creates certain tax obligations with Pennsylvania."[8] (The letter does not acknowledge that *Amazon* chose to store that inventory in the Commonwealth.) The Department "believes that [you] may have unpaid tax liabilities in Pennsylvania based on [your] business' physical presence."[9] Those liabilities include finding the money to pay for sales taxes Amazon did not collect from *Amazon's customers* years ago, as well

---

[5] Doc. 10-1 ¶¶ 4–19 (declaration of the Guild's Executive Director).
[6] *Id.* ¶ 22.
[7] *Id.*
[8] Doc. 10-2 at 5 (exemplar Department letter sent to Guild member). The letters do not specifically mention Amazon, but there cannot be any serious doubt—and the Department does not deny—that the letters' reference to fulfillment centers includes Amazon's FBA fulfillment centers. Likewise, based on the sheer number of letter recipients and the nature of the Guild's members who have received letters, it is likely that the Department got the list of names from Amazon.
[9] Doc. 10-2 at 5.

as incurring ongoing compliance costs, "which can be thousands of dollars per state—a significant sum for small businesses with thin margins."[10]

If you register with the Department, your "unpaid tax liabilities" will be limited to just "Jan. 1, 2019" and you will "be given penalty relief for any non-compliance."[11] In order to register, though, you need to disclose whether you use a fulfillment center or similar facility in the Commonwealth, in which case the Department's view is that you are subject to the Department's taxing authority.[12]

But if you decline to register—say you believe the Constitution precludes the Department from imposing those liabilities on you—your "[f]ailure to provide the information requested will result in additional enforcement actions and [you] will forfeit any penalty relief or limited lookback provisions."[13] In short, you can either give in now, or things will get worse for you. Oh, and the letters warn that you better decide within 15 days of when the letter was mailed (although the Department subsequently stipulated to extend the decision period to May 8, 2021).[14]

---

[10] Doc. 10-1 ¶¶ 24–25.
[11] Doc. 10-2 at 5.
[12] Doc. 10-2 at 8. The Department's suggestion that individual tax liability is conditional, Doc. 25 at 12, is beside the point. The Department may not yet possess the individual facts to make a "definitive determination," *id.*, about whether specific individuals are subject to the Department's tax authority. But the Department has made its underlying legal position clear: the presence of inventory in a fulfillment center gives the Department that authority. Doc. 10-2 at 5. And it is that position the Guild challenges.
[13] Doc. 10-2 at 5.
[14] Doc. 22 ¶¶ 1; 9–13.

Receiving a letter like that would reasonably make anyone concerned, and has in fact concerned Guild members, leading them to "refrain[] from business activity due to the chilling effects of enforcement by the DOR and other state authorities."[15] Those facts, which are essentially undisputed, give rise to a cognizable controversy.

### b. The Guild has standing to seek equitable relief.

#### 1. The Guild has associational standing.

The Guild satisfies the test for associational standing because, *inter alia*, "its members would otherwise have standing to sue in their own right." *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 283 (3d Cir. 2002).[16] The gist of the Department's argument to the contrary is that the Guild's members have not been injured within the meaning of Article III because all the Department has done so far is send letters. But, as explained above, that is an artificially narrow view of what the letters say and stand for, and the real-world impacts the letters have already had.

---

[15] Doc. 10-1 ¶¶ 26–27; *see also* Doc. 10-2 ¶ 11 (Guild member describing how the "concern and chaos" resulting from the actions of the Department, and other states' tax collectors, have harmed his business, making him "reluctant to expand [his] e-commerce business or make investments that could be compromised"); Doc. 10-3 ¶ 12 (similar).

[16] The Department does not deny that the Guild's claims are "germane to the [Guild's] purpose." *Pa. Psychiatric Soc'y*, 280 F.3d at 283; *see also* Doc. 10-1 ¶ 3; 28 (the Guild's Executive Director explaining how the Guild's claims are germane). Similarly, the Department does not dispute that the Guild's claims will require at most "limited individual participation" to illustrate the challenged policy. *Pa. Psychiatric Soc'y*, 280 F.3d at 283–86.

Compare, for example, the Supreme Court's *Susan B. Anthony List* decision, which is probably the leading case on Article III injury in the pre-enforcement setting. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).[17] There the Court emphasized the longstanding rule of pre-enforcement challenges as against the state: "Where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat. . . . Specifically, we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 158–59 (cleaned up; emphasis in original).

The Guild's members meet that standard. They have received (or fear receiving) some of the 11,000+ letters the Department has sent, outlining the Department's legal position and warning of "enforcement action" and increased liability for those who do not comply. Although the Department may not have initiated any enforcement action yet, that is probably due to the timing—the "voluntary compliance program" runs until May 8, 2021.[18] And nowhere does the Department concede that it will not pursue the enforcement action it expressly

---

[17] As the *Susan B. Anthony List* Court explained, challenges to whether the plaintiff has been adequately injured can carry the label of standing and ripeness, but they "originate from the same Article III limitation" and can "boil down to the same question." 573 U.S. at 157 n.5 (cleaned up).
[18] *See* Doc. 22 ¶ 10.

warned about. Guild members must decide—within a few weeks—whether they will submit to the Department's demands or stand on their constitutional objections and risk the consequences. The impacts on the Guild's members are concrete, not "imaginary or wholly speculative." *Susan B. Anthony List*, 573 U.S. at 160.

Given the Department's posture, there are multiple reasons for bringing a pre-enforcement challenge, which the Supreme Court has long permitted because "it is not necessary that [Americans] expose [themselves] to actual arrest or prosecution to be entitled to challenge a statute that [they] claim[] deters the exercise of [their] constitutional rights." *Id.* at 158 (cleaned up). For one thing, the Department's assertion of power is already causing real-world impacts as businesses must decide what to do—register or not. *Cf. id.* at 161–62 (parties are cognizably injured when they must choose between their preferred course of conduct and the government's expressed demands). For another, once the Department's posture matures into one of tax "assessment, levy or collection," the Guild and its members will have to grapple with the Tax Injunction Act, 28 U.S.C. § 1341, which will impact federal jurisdiction. *Cf. Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1 (2015) (allowing challenge to state information-gathering demands because those demands "precede the steps of 'assessment' and 'collection'").[19]

---

[19] The Department's view of the TIA, as turning on whether a plaintiff challenges state authority to impose a tax obligation, Doc. 25 at 12, is contrary to *Direct Marketing Association*. The TIA analysis is textual and turns on whether the claim specifically challenges an act of "assessment, levy or collection" as opposed to some other

7

Because the Guild's members have been cognizably injured and credibly fear enforcement by the Department, and the Guild satisfies the other associational standing requirements, the Guild has associational standing.

**2. The Guild has organizational standing**

The "standing of [the Guild] to bring this suit is consistent with the long line of cases in which organizations have sued to enforce civil rights [and] civil liberties." *Powell v. Ridge*, 189 F.3d 387, 404 (3d Cir. 1999) (collecting cases). As the Department acknowledges, the Guild has standing insofar as the Guild has had to divert resources to address the Department's conduct, because "[a]n organization may establish a 'concrete and demonstrable injury' sufficient to confer standing if a defendant's actions 'perceptibly impair' the organization's ability to provide services." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285 (3d Cir. 2014) (quoting H*avens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)).

The Department raises a question about whether the Guild really had to divert resources, arguing that responding to its members' concerns with the Department's position is "the exact action[] for which [the Guild] was organized."[20] But the law is otherwise, and so is the record at this early stage. *See Speech First, Inc. v. Fenves*, 979 F.3d

---

measure, not why the plaintiff challenges the measure in question. 575 U.S. at 11-12 & n.1 (explaining the textual limitations of the TIA). In any event, that doctrine is not at issue here because it is undisputed that the Guild is not challenging an act of "assessment, levy or collection."

[20] Doc. 25 at 11.

319, 330 (5th Cir. 2020) ("At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand.") (collecting cases). In terms of the law, the standing inquiry does not operate at the Department's level of generality, in which trade associations and civil rights groups lack standing *because* the challenged government action is broadly germane to their organizational mission. The Department's own reliance on *Blunt* makes that clear. *Blunt* held that an organization was not injured because the organization was "targeted only at [the defendant], so its very purpose was to expend resources to educate the public regarding the [defendant's] behavior"; absent the challenged conduct, "all of [the plaintiff's] resources would necessarily have been spent on [defendant]-related projects" anyway. *Blunt*, 767 F.3d at 278, 285–86.

The Guild, by contrast, is not "targeted only at" the Pennsylvania Department of Revenue (or revenue departments generally), and absent the Department's challenged conduct, the Guild would not have spent resources addressing that conduct or the Department's actions generally.[21] Rather, as in *Havens*, the Department's conduct has caused the Guild to divert resources from other aspects of its mission to address the specific government practice and policy at issue here. 455 U.S. at 379. Because the Guild has been injured, the Guild has standing.

---

[21] *See* Doc. 10-1 ¶¶ 3; 28 (describing the Guild's broad, multi-faceted mission to "advocate for a free and fairly regulated online marketplace, and for the interests of online merchants" and how, "in recent weeks, the Guild has had to devote resources to addressing the DOR's newer actions").

### c. The Guild's claims are ripe.

The Guild's claims are ripe under *Susan B. Anthony List*. The Department raises a challenge under the prudential ripeness doctrine, which examines the fitness of the issue for present review and the potential hardship from denying review. *See* 573 U.S. at 167–68.[22] As this Court has acknowledged, related considerations in the pre-enforcement context include whether the parties have "sufficiently adverse legal interests," the facts are "sufficiently concrete," and a judgment (or in this instance a preliminary injunction) would have "utility" or be of "practical help to the parties." *Abu-Jamal v. Kane*, 96 F. Supp. 3d 447, 458 (M.D. Pa. 2015).

As in *Abu-Jamal*, the Department's "ripeness argument suffers the same maladies as [the Department's] standing position." *Id.* The Department's framing of the Guild's theory is artificially narrow. The Guild does not challenge whether the Department could lawfully mail letters as such, but whether the DOR has the constitutional authority to embark on the regulatory path the letters represent. The Department's brief does not deny claiming such authority, and after all the Department must have assumed a lawful basis for its collection efforts. Hence, the parties' interests are adverse.

---

[22] The Supreme Court raised a question about the "continuing vitality of the prudential ripeness doctrine" because it "is in some tension with the [Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List*, 573 U.S. at 167 (cleaned up). But, like the Supreme Court in *Susan B. Anthony List*, this Court need not grapple with that issue because the ripeness test is "easily satisfied here." *Id.*

10

The Guild's actual theory—that the Department lacks the asserted power under the Due Process Clause—is concrete enough for consideration. For present purposes, the factual issues are straightforward and undisputed, leaving a "purely legal" issue to decide. *See Susan B. Anthony List*, 573 U.S. at 167. That issue is whether Amazon's unilateral decision to sometimes store goods in Amazon warehouses in the Commonwealth gives the Department personal jurisdiction over third parties who previously supplied those goods to Amazon. The Department does not explain why further factual development is necessary to make that issue concrete enough for decision. The lawfulness of the Department's policy does not depend on the specific identities of FBA suppliers whose goods Amazon stored in its Pennsylvania warehouses. The question is whether that basic fact pattern—which is undisputed—gives the Department the power it claims.

Similarly, denying review "would impose substantial hardship" because the Guild's members would have to "choose between" complying with challenged authority on one hand and "risking costly" enforcement action if they resist. *Susan B. Anthony List*, 573 U.S. at 167–68. If, as the Guild argues, the Department lacks authority, then members will likely not go to the trouble and expense of complying with an *ultra vires* request; on the other hand, if the Department does have such authority, then members face increased liability exposure if they do not comply. For similar reasons, a ruling would have significant practical "utility." *Abu-Jamal*, 96 F. Supp. 3d at 458. This matter is ripe.

**d. The Department has not met its burden to justify abstention.**

As the party seeking abstention, the Department bore a "heavy burden of persuasion that abstention is appropriate." *Weathers v. Sch. Dist. of Phila.*, 2019 U.S. Dist. LEXIS 44545 (E.D. Pa. 2019) (cleaned up); *accord Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) ("Federal courts, it was early and famously said, have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."). And because this case moreover involves important "federal issues," the Department's burden is "heightened" because the "'presence of federal-law issues must always be a major consideration weighing against surrender of jurisdiction.'" *Grode v. Mut. Fire, Marine & Inland Ins. Co.*, 8 F.3d 953, 960 (3d Cir. 1993) (*quoting Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 26 (1982)).

The Department did not meet its burden. Although the Department rightly cited the *Levin* case, *Levin* does not authorize blanket abstention in every federal case touching on state taxes. As the Guild explained in its opening brief, Justice Ginsburg's opinion identified several "considerations" which came together "in combination" to require abstention. 560 U.S. at 431–32. Those considerations cut against abstention in this case, as do others, such as the strong federal and interstate interests at stake.[23] The Department did not address those considerations or rebut those arguments to explain why abstention is proper notwithstanding them.

---

[23] Doc. 10 at 9–11.

*Levin* also recognized that comity abstention requires an adequate alternative remedy in state court. 460 U.S. at 421–22. The Guild does not appear to have a means of challenging the Department's registration position in the Commonwealth's courts. In general, Pennsylvania requires exhaustion of administrative remedies, which would presumably require affected merchants—not the Guild—to register, at some point be taxed, pay the tax, file for a tax refund on federal constitutional grounds, and then seek relief in court if the refund were denied. *See Cherry v. City of Phila.*, 692 A.2d 1082, 1084 (Pa. 1997).[24] Because the Guild cannot take that path, comity abstention would leave the Guild remediless, which abstention doctrine does not countenance.

### e. On the merits, the Guild has met its burden to justify preliminary injunctive relief.

On the merits, the Court's work is simplified because the Department declined to contest the Guild's arguments on their own terms. Instead, the Department tried to minimize the nature of the injury. As explained above, that attempt fails.

Turning to the Guild's actual theory, there is a large body of law holding that, like every arm of state government, the Department is restrained by the Due Process Clause's restrictions on the exercise of personal jurisdiction over non-residents.[25] In a

---

[24] Pennsylvania law does provide a "'constitutional attack' exception to the doctrine of exhaustion of administrative remedies," but that exception is "extraordinarily narrow" and requires, *inter alia*, that the plaintiff "challenge a statute or regulation in its entirety." *Humphrey v. Dep't of Corr.*, 939 A.2d 987, 993 (Pa. Commw. Ct. 2007). It is unclear whether the Guild could fit its claims within that narrow exception.

[25] Personal jurisdiction limits on state power primarily come from the "Due Process Clause of the Fourteenth Amendment." *Walden v. Fiore*, 571 U.S. 277, 283 (2014). In

13

nutshell here, the Department lacks the authority to regulate or tax non-residents merely because a third party like Amazon unilaterally decided to store goods in the Commonwealth, which is nonetheless the basis for the Department's assertion of jurisdiction. The Department does not dispute that body of law or explain why the law does not support the Guild's position. As such, the Court should conclude that the Guild has a "reasonable chance of success on the merits." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). (The Department remains free, of course, to address the merits down the road.)[26]

The injuries in question are irreparable, which the Department likewise failed to dispute. In addition to the loss of constitutional rights, there are difficult-to-quantify and difficult-to-unwind impacts on the Guild's members' businesses and the interstate market in which they operate more generally. The Guild itself does not seek damages. Although in principle some Guild members could perhaps seek tax refunds at some future point, there does not appear to be a state remedy by which they could seek financial recovery for the injuries associated with registration (such as, in addition to

---

*Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017), Justice Alito explained that limits on state power also arise from the inherent structure of our federal system: "The sovereignty of each State implies a limitation on the sovereignty of all its sister States." (cleaned up).

[26] For now, the Court can disregard the Department's opposition to the Guild's Commerce Clause and Internet Tax Freedom Act claims because the Guild did not seek preliminary injunctive relief as to those claims. If the Department intends to challenge those claims' plausibility, the Department can move under Rule 12.

14

the above, the costs of compliance), and all of that is a long way off. In short, this is a classic pre-enforcement case where only equitable relief is really in play.

The public and private interest factors favor an injunction. The Guild is sensitive to the importance of state tax collection, but several considerations reduce the weight of that consideration here. *First*, to the extent the Guild prevails on the merits, the Commonwealth would not be entitled to impose the challenged tax obligation on the Guild's members anyway. *Second*, to the extent the Department wants to collect past tax revenue for sales on Amazon.com, nothing about the requested injunction would prevent the Department from taking that matter up with Amazon; Amazon is already collecting sales taxes on a prospective basis. *Third*, although it is the Guild's burden to establish entitlement to a preliminary injunction, the Department declined to offer any concrete evidence of harm from the requested injunction that could not be mitigated by other measures. And last, it is in the public interest to enforce constitutional rights.

## Conclusion

For the foregoing reasons, the Online Merchants Guild respectfully requests that the Court preliminarily enjoin Defendant Hassell from making or enforcing demands that non-resident Guild members register with the Department because of their participation in Amazon's FBA program.

Respectfully submitted this 8th day of April, 2021.

*s/ Aaron K. Block*

David F. Wilk
ID#65992
Lepley, Engelman, Yaw & Wilk, LLC
140 East Third Street
Williamsport, Pennsylvania 17701
570-323-3768
davew@lepleylaw.com

Aaron K. Block (admitted *pro hac vice*)
The Block Firm LLC
4200 Northside Parkway
Building 1, Suite 200
Atlanta, Georgia 30327
404-997-8419
aaron@blockfirmllc.com

Paul S. Rafelson (*pro hac vice* motion filed)
Rafelson Schick, PLLC
2255 Glades Road, Suite 319
Boca Raton, Florida 33431
833-326-6529
paul@frsattorneys.com
Counsel for the Online Merchants Guild

**Certificate of Service**

I hereby certify that I served the foregoing via the Court's CM/ECF system this 8th day of April, 2021.

*s/ Aaron K. Block*
Aaron K. Block
