IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ONLINE MERCHANTS GUILD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:21-cv-00369-CCC |
| ) | |
| C. DANIEL HASSELL, ) | |
| in his official capacity as ) | |
| SECRETARY OF REVENUE, ) | |
| DEPARTMENT OF REVENUE, ) | |
| ) | |
| Defendant. ) | |

**The Online Merchants Guild's Opposition to Defendant's Motion to Dismiss**

The Court should deny the Department's motion to dismiss, which is contrary to Supreme Court and Third Circuit precedent and the complaint's allegations.

**Standards of Review**

**FRCP 19**: The moving party has the burden under Rule 19(a). *Epsilon Energy United States, Inc. v. Chesapeake Appalachia, LLC*, No. 1:21-CV-00658, 2021 U.S. Dist. LEXIS 79076, *17 (M.D. Pa. Apr. 26, 2021). The dispositive question here is whether any absent parties are truly necessary within the meaning of Rule 19. *Janney v. Montgomery Scott, Inc. v. Shepard Niles*, 11 F.3d 399, 404–05 (3d Cir. 1993).

**Standing**: The Guild bears the burden to demonstrate standing consistent "with the manner and degree of evidence required at the successive stages of

1

litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014).

**Ripeness**: The Rule "12(b)(1) standard [for the Department's facial ripeness challenge] is functionally identical to that which the court must apply under Rule 12(b)6)." *Democracy Rising PA v. Celluci*, 603 F. Supp. 2d 780, 787 n.10 (M.D. Pa. 2009).

**The Merits**: On a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.42 (3d Cir. 2010).

## Argument

### I. The Department's Rule 19 argument fails because the Guild did not need to join its hundreds of members or Amazon.

#### a. It is unnecessary to join the Guild's members.

The Department's Rule 19 argument is contrary to decades of precedent and practice in civil rights litigation. As then-Judge Alito explained, "[t]he Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual association members." *Hospital Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991); *accord, e.g., Retired Chicago Police Ass'n v.*

*City of Chicago*, 7 F.3d 584, 601 (7th Cir. 1993) (agreeing with the Third Circuit's "sound" approach). Hence, the settled practice: association-led cases are common, yet rarely if ever do they involve compulsory joinder of members. Thus, for example, it was *NFIB v. Sebelius*, not *NFIB and Tens of Thousands of Small Businesses v. Sebelius*.

Joinder of individual members is not necessary even if equitable claims "would require some participation by some [association] members" to develop common facts. *Hospital Council*, 949 F.2d at 89. As the Seventh Circuit explained, "[w]e can discern no indication in *Warth*, *Hunt*, or *Brock* that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association." *Retired Chicago Police Ass'n*, 7 F.3d at 601–02. "Such a stringent limitation on representational standing cannot be squared with the Court's assessment in *Brock* of the efficiencies for both litigants and the judicial system from the use of representational standing." *Id.*

*Hospital Council* and similar decisions govern even though they were generally decided as associational standing cases rather than as Rule 19 cases. Rule 19 looks to the body of law that will govern the dispute to determine whether a party is necessary. *See, e.g.*, *Janney*, 11 F.3d at 406–12 (relying on principles of substantive law and procedural law like *res judicata* to analyze the Rule 19 question). It would make little sense for association members to be unnecessary for standing purposes but necessary under Rule 19. The Department's view of member participation would undermine a settled feature of federal equity practice and would call into question any number of

3

precedents. *See, e.g., Int'l Union v. Brock*, 477 U.S. 274, 289–90 (1986) (refusing to "abandon settled principles of associational standing," which allows citizens to "pool their capital [and] their interests" and litigate common issues, which is "advantageous both to the individuals represented and to the judicial system as a whole").

Here, the Guild challenges an overarching policy based on a common fact pattern: the Department's decision to deem the presence of goods in Amazon's Pennsylvania FBA warehouses sufficient to give the Department registration authority over the FBA merchants who supplied those goods. The general lawfulness of that common policy does not depend on the specifics of hundreds of individual members. If the Department needs information about how Guild members interact with Amazon, the Department can obtain it from the Guild or from representative members through standard third-party discovery tools. For similar reasons, if the Department needs individual-specific information to ensure it complies with any injunction, the Department can obtain it without joining those individuals as parties. Joinder of the Guild's members is unnecessary.

### b. Joinder of Amazon is unnecessary.

Amazon is not a necessary party under Rule 19(a)(1)(A) or (B) because the Guild does not seek to enforce the Business Solutions Agreement between members and Amazon and Amazon has no qualifying legal interest in this case. Guild members' contractual relationship with Amazon simply informs the factual background: how it came to be that goods FBA participants supply to Amazon are in Amazon's

4

Pennsylvania warehouses. Analyzing constitutional law on top of that background does not require litigation of the contract as such, much less Amazon's joinder.

The Department invokes the doctrine that "a contracting party is the paradigm of an indispensable party," Doc. 50 at 9, but takes that doctrine out of context. Contract counter-parties may be indispensable in suits seeking to "invalidate the contract," or where there are potential co-plaintiffs affected by the same alleged breach, because in those instances the court probably needs all parties before it to adjudicate their rights consistently. *Nomanbhoy v. Boxwalla*, No. 12 C 5969, 2013 U.S. Dist. LEXIS 11345 (N.D. Ill. Jan. 29, 2013) (synthesizing the "prevailing view among the courts of appeals," including the Third Circuit).

But the mere existence of a contract does not make every party to that contract indispensable in every suit involving the contract. That is why the Third Circuit—in the Department's main Rule 19 case—recognized a long line of authority under which "court[s] have power to grant complete relief in [the] absence of" all parties to a contract. *Janney*, 11 F.3d at 406 (3d Cir. 1993). The operative question under Rule 19(a)(1)(A) is not whether there are present and absent parties to a contract, but whether the Court can afford "complete relief . . . in a suit [involving] only one of

them." *Id.* If the Court can grant complete relief to the existing parties, the "effect a decision may have on the absent party is not material." *Id.* at 405.[1]

This dispute is between the Guild and its members on the one hand, and the Department on the other. The Guild does not seek enforcement of the Amazon BSA—vis-à-vis Amazon or anyone else. The Court can grant complete relief without Amazon's involvement, and Amazon is thus unnecessary under Rule 19(a)(1)(A).

Amazon is not a necessary party under Rule 19(a)(1)(B) for two reasons. First, Amazon "cannot qualify as necessary" because it lacks a "legally protected interest . . . in the action." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 230 (3d Cir. 2005). The Guild seeks resolution of its members' registration obligations to the Department, not disposition of a *res* to which both Amazon and members claim title, or adjudication of obligations as between Amazon and members. The Department points out that the BSA contains a term under which FBA suppliers are "responsible for the collection, reporting, and payment of any and all of Your Taxes," Doc. 50 at 13, but the Guild is not asking the Court to allocate tax liability as between members and Amazon under the BSA. Tax liability is a matter of state and federal law, not private contract, anyway, as the Department would surely argue if the Department were seeking to collect taxes rather than dismiss this case. *See Scripto v. Carson*, 362 U.S.

---

[1] The Advisory Committee made "stylistic only" changes to Rule 19 in 2007. FRCP 19 Adv. Comm. Note. Accordingly, references in pre-2007 cases to former sections (a)(1) and (a)(2), such as in *Janney*, now correspond to (a)(1)(A) and (a)(1)(B), respectively.

207, 211 (1960) (the courts do not "permit formal 'contractual shifts'" to alter tax liability because it would "open the gates to a stampede of tax avoidance"). At the very most, Amazon would have "merely a financial interest or interest of convenience" in this case, which is insufficient. *Liberty Mut. Ins. Co.*, 419 F.3d at 230.

Second, Rule 19(a)(1)(B) is concerned with whether a judgment would have *preclusive* effects on the absent party's legal rights, not indeterminate effects on other interests. *See, e.g.*, *Janney*, 11 F.3d at 409 (rejecting application of now-Rule 19(a)(1)(B)(i) because the defendant did not establish that a judgment would "preclude the absent party with respect to an issue material to the absent party's rights or duties under standard principles governing the effect of prior judgments"); *id.* at 411–12 (rejecting application of what is now Rule 19(a)(1)(B)(ii) because an "outcome adverse" in the instant action "does not have any legal effect on whatever right" may be at issue in a separate action). Amazon's joinder is unnecessary.[2]

## II.   The Court has subject-matter jurisdiction.

As the Guild explained in preliminary injunction briefing responding to more or less the same arguments, the Guild has standing and its claims are ripe. For efficiency, the Guild will concentrate below on the Department's new variations on those arguments.

---

[2] Because the Department did not meet its burden under Rule 19(a), it is "unnecessary" to consider whether any parties are "indispensable" under Rule 19(b). *Janney*, 11 F.3d at 413.

### a. The Guild has organizational standing.

The Department primarily appears to argue that the Guild has been insufficiently injured by the Department's challenged conduct, but that argument is at odds with the law and the allegations. "In the context of a *motion to dismiss*, . . . the injury-in-fact element is . . . very generous, requiring only that claimant allege some specific, identifiable trifle of injury." *Blunt*, 767 F.3d at 278 (emphasis in original).

The Guild has alleged more than a trifle. As the Complaint and associated declaration of the Guild's Executive Director outline, the Guild's general mission involves policy advocacy and member education "and similar traditional trade association work" in the service of a "free and fairly regulated online marketplace." Doc. 1 ¶¶ 14–15; Doc. 1-4 ¶ 3. But the Guild has been forced to address the Department's challenged actions as a result of members' concerns with the Department's registration efforts. Doc. 1-4 ¶¶ 23–28. Mr. Rafelson expanded on the Guild's mission and the diversion of resources at the preliminary injunction hearing. The Department also disputes the causal connection between the Department's actions, Guild members' fears, and the Guild's response. *See* Doc. 50 at 13. But at this stage, the Court has to assume that Guild's members' concerns in response to the Department's letters are genuine (as was evident at the preliminary injunction hearing). The Department can test the Guild's injuries during discovery, but there is enough to meet the minimal *Blunt* injury standard.

Lastly, the Department asserts that the Guild's members' pre-enforcement concerns do not satisfy the *Susan B. Anthony List* standard. But as the Guild has explained, the Guild's members reasonably fear the "enforcement action" the Department expressly threatened, as well as the burdensome costs of complying with the Department's demands. Doc. 26 at 5–8. That is a cognizable injury for this stage.

### b. The Guild's claims are ripe.

The Department's latest ripeness argument is inapt. The gist seems to be that the Department has questions about how Amazon comes to store goods in Pennsylvania warehouses (questions one would hope the Department would have investigated *before* launching a mass-registration effort), and whether Guild members had goods stored in those warehouses. Those evidentiary questions will have to be addressed on an evidentiary record, not decided against the Guild on the papers.

## III. The Guild's claims satisfy Rule 12(b)(6).

### a. The Guild states a due process claim.

The Due Process Clause restricts the Department's regulatory authority over non-residents. That general principle is older than our Nation. *See, e.g.*, *Miller Bros. v. Md.*, 347 U.S. 340, 342 (1954) (invoking the "venerable" principle that "[j]urisdiction is as necessary to valid legislative as to valid judicial action").

In the tax context, the Supreme Court has relied on the same due process decisions as in the familiar civil litigation context. *See, e.g.*, *S.D. v. Wayfair*, 138 S. Ct. 2080, 2093 (2018) (relying on *Burger King v. Rudzewicz*, 471 U.S. 462 (1985)); *Quill Corp.*

*v. N.D.*, 504 U.S. 298, 307 (1992) (relying on *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)); *cf. Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 221 F.3d 1211, 1216 (11th Cir. 2000) (linking the test for "legislative jurisdiction" to the traditional due process personal jurisdiction test).[3]

The core due process requirement is minimum contacts. *Wayfair*, 138 S. Ct. at 2085. That standard looks to whether the putative subject of jurisdiction "purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018). The "unilateral activity of a third party [] cannot satisfy the requirement of contact with the forum State necessary to establish jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 291 (2014). And jurisdiction must rest on something other than the stream of commerce carrying a good into a state. *Shuker*, 885 F.3d at 780 (explaining that a "plurality of Supreme Court Justices has twice rejected" the stream-of-commerce theory, which the Third Circuit has "decline[d] to

---

[3] At the preliminary injunction hearing, the Court raised the thoughtful question whether the due process standard might perhaps be different for tax-related registration as opposed to actual taxation. The Guild is not aware of case law to that effect in the due process context, which tends to take a categorical approach to the threshold minimum contacts question—the state either has or lacks jurisdiction over the person, regardless of what the state's interest is. *Cf., e.g.*, *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1781 (2017) (rejecting the "California Supreme Court's 'sliding-scale approach'" to specific jurisdiction as "difficult to square with our precedents"). In the adjacent Commerce Clause context, by contrast, the undue-burden analysis would involve a weighing of the costs and benefits of the particular measure under review.

adopt"). Likewise, "efforts to exploit a national market that necessarily included Pennsylvania are insufficient" to create jurisdiction. *Id.*

Guild members do not deliberately seek affiliation with Pennsylvania by merely participating in Amazon's FBA program. Doc. 1 at ¶¶ 19–23; 26–27. To the extent goods they supply to Amazon are in Pennsylvania, it is because the stream of commerce—as unilaterally controlled by Amazon—carried them there as opposed to elsewhere on the continent. At this stage, those allegations plausibly support the Guild's theory that the Department lacks personal jurisdiction over the Guild's members based on their FBA participation.

The Department does not address the controlling precedents. Instead, the Department argues that *Wayfair* did away with the Due Process Clause in the tax context, such that a showing of Commerce Clause nexus suffices for due process purposes too. *See* Doc. 50 at 17. *Wayfair* held no such thing. The "nexus" language the Department cites about availing oneself of the "substantial privilege" of "carrying on business" in the jurisdiction relates to the *Complete Auto* test, which is a Commerce Clause test. *See Wayfair*, 138 S. Ct. at 2099; *see also id.* at 2093 (explaining that Commerce Clause nexus and Due Process Clause minimum contacts are "closely related" standards, but the standards are not "identical or conterminous"); *accord Quill Corp.*, 504 U.S. at 305 (explaining that the clauses and their respective tests "are analytically distinct" because the clauses "reflect different constitutional concerns" and implicate different grants of power to government). *Wayfair* was significant

practically, but doctrinally what *Wayfair* did was targeted: eliminate the bright-line physical-presence rule under the Commerce Clause, not erase other traditional protections. *See, e.g.*, 138 S. Ct. at 2098–99 (explaining that various "other aspects" of Supreme Court doctrine will continue to govern the interstate economy).

So the question remains whether the Department can satisfy the traditional due process standard as reflected in multiple Supreme Court and Third Circuit cases. Instead of engaging with those cases, the Department relies on the *Oberdorf* litigation to argue about what the Department thinks the law should be. Doc. 50 at 17 (incorporating Doc. 46 at 17). *See also Oberdorf v. Amazon.com, Inc.*, 930 F.3d 136 (3d Cir. 2019) (holding Amazon is liable as a seller under Pennsylvania product liability law), *vacated by* 936 F.3d 182 (3d Cir. 2019) (*en banc*), *certified to the Pennsylvania Supreme Court by* 818 F. App'x 138 (3d Cir. 2020). Whatever *Oberdorf* means for product liability law, it is not a due process case; it did not seek to, and did not, overrule a developed body of law rejecting the Department's position. The Guild states a plausible claim.

### b. The Guild states a Commerce Clause claim.

The Commerce Clause imposes various limits on state authority over interstate commerce. *Wayfair*, 138 S. Ct. at 2089–90. There are "two primary principles" that animate Commerce Clause jurisprudence. *Id.* at 2090. State regulations (1) "may not discriminate against interstate commerce," and (2) "may not impose undue burdens on interstate commerce." *Id.* Whether a burden is undue tends to require a "sensitive, case-by-case analysis of purposes and effects." *Id.* at 2094. *Wayfair* identified some

12

features of state tax regimes that could impose undue burdens on small e-commerce merchants in particular, including state regimes that place onerous compliance burdens on merchants who make a modest amount of sales, and retroactive changes in liability, among others. *Id.* at 2098.

The Guild's Complaint raises several Commerce Clause concerns. Among them, the Guild alleges that the Department's decision to compel non-resident merchants to register as tax collectors for Amazon's sales is driven by discrimination in favor of Amazon's local presence and power. Doc. 1 ¶ 54. The Guild also challenges the Department's application of the Commonwealth's "*Wayfair* threshold," which is supposed to protect small non-residents from excessive compliance burdens in multiple states. Doc. 1 ¶ 40. According to the Department's registration demands, non-residents are not really non-residents if Amazon chooses to store goods they supplied in a Pennsylvania warehouse. *Id.* ¶ 47. That position would nullify *Wayfair*, which the Department cannot do.[4]

The Department's motion does not challenge the Guild's legal theories, but summarily asserts that the supporting allegations are insufficient. The complaint and supporting affidavits, however, explain both the Department's actions and how those

---

[4] Although the Department refers to the extraterritoriality doctrine, Doc. 50 at 18, the Guild does not bring a claim under that aspect of the Commerce Clause because there is no argument that the Department is, for example, seeking to set prices in the interstate market. *See* Doc. 1 at Count 2 (not mentioning the extraterritoriality doctrine).

actions are perceived by and are impacting real people and burdening their participation in interstate commerce. *E.g.*, Doc. 1 ¶¶ 44; Doc 1-2 ¶¶ 7–11; Doc. 1-3 ¶¶ 8-12. Those claims will be fleshed out in discovery, but the Department cannot defeat allegations by simply discounting them. The Commerce Clause claims are plausible.

### c. The Guild states an Internet Tax Freedom Act claim.

The Internet Tax Freedom Act prohibits states from imposing "discriminatory taxes on electronic commerce," one form of which is imposing "an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means." ITFA § 1101(a)(2); § 1105(2)(A)(iii), codified at 47 U.S.C. § 151, Note. Essentially, states must impose the same tax-related obligations on e-commerce businesses and comparable brick-and-mortar businesses; contrary laws are preempted. *See, e.g.*, *Performance Mktg. Ass'n v. Hamer*, 998 N.E.2d 54, 57 (Ill. 2013) (striking down tax obligation imposed on e-commerce but not brick-and-mortar retailers).

Amazon FBA operates like a consignment operation, with Amazon taking physical custody of goods, interfacing with customers, processing sales, and conveying goods to customers. Doc. 1 ¶¶ 19–24. The Guild alleges that the Department of Revenue does not, in practice, compel suppliers of brick-and-mortar consignment stores to register as putative tax collectors. *Id.* ¶ 60. After all, the stores, not the suppliers, are at the point of sale and actually collect money from consumers.

But, the Guild alleges, the Department "has adopted a special practice by seeking to treat Amazon's consignor-suppliers as tax agents and requiring them to register accordingly." *Id.* The reason, the Guild alleges, is Amazon's relative economic and political power as compared to the Guild's non-resident members. *Id.* ¶¶ 4; 54. If discovery bears that theory out, that discriminatory treatment would violate the Internet Tax Freedom Act.

The Department does not contest the Guild's legal theory, but simply disputes the factual allegations. Doc. 50 at 18. Without discovery into how the Department has treated similar businesses (and what explains the apparent preferential treatment for Amazon), the Guild cannot be expected to prove its theory on the merits. The Court should accordingly deny the Department's challenge to the pleadings.

## Conclusion

For the foregoing reasons, the Online Merchants Guild respectfully requests that the Court deny the Department's motion to dismiss.

\*\*\*

Respectfully submitted this 27th day of May, 2021.

*s/ Aaron K. Block*

David F. Wilk
ID#65992
Lepley, Engelman, Yaw & Wilk, LLC
140 East Third Street
Williamsport, Pennsylvania 17701
570-323-3768
davew@lepleylaw.com

Aaron K. Block (admitted *pro hac vice*)
The Block Firm LLC
4200 Northside Parkway
Building 1, Suite 200
Atlanta, Georgia 30327
404-997-8419
aaron@blockfirmllc.com

Paul S. Rafelson (*pro hac vice* motion filed)
Rafelson Schick, PLLC
2255 Glades Road, Suite 319
Boca Raton, Florida 33431
833-326-6529
paul@frsattorneys.com
Counsel for the Online Merchants Guild

16

## Certificate of Service

I hereby certify that I served the foregoing via the Court's CM/ECF system this 27th day of May, 2021.

*s/ Aaron K. Block*
Aaron K. Block